## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

David McDaniel,

Plaintiff,

v.

Progress Rail Locomotive,

Defendant.

Case No. 17-cv-7904

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff David McDaniel sued his former employer, Progress Rail Locomotive, Inc., under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, alleging that Defendant both discriminated and retaliated against him in violation of the statute (Counts One and Two). [1]. Plaintiff also brings a retaliatory discharge claim under Illinois law (Count Three). *Id.* Progress Rail moved for summary judgment. [42]. For the reasons explained below, this Court grants Defendant's motion.

## I.    Background

### A.    Local Rule 56.1 and Evidentiary Rules

The facts in this discussion come from Defendant's Local Rule 56.1 statement of material facts [44] and Plaintiff's Local Rule 56.1 statement of additional facts [45]. This Court has broad discretion to enforce the local rules governing summary judgment. *See, e.g.*, *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).

1

Plaintiff has objected to many of Progress Rail's facts, which are based upon a variety of different exhibits, on general "hearsay and foundation" grounds. *See* [45] ¶¶ 44, 45, 63, 64, 65, 66, 67, 68, 69. Specifically, all but one of Plaintiff's objections concern Progress Rail's routine investigatory interview and disciplinary hearing forms, [44-19]; [44-25]; [44-26]; [44-27]; [44-28], which either transcribe (in the interviews) or summarize (in the hearings) the questions asked by Plaintiff's supervisor, Jonathan Howard, and the responses given by Plaintiff. This Court will first address the admissibility of these forms before proceeding to Plaintiff's additional objections.

### 1. Plaintiff's Foundation Objections

First, regarding Plaintiff's foundation objections, Fed. R. Civ. P. 56(c)(2) permits a party to object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *See Rao v. Gondi*, 2017 WL 2445131, No. 14 C 66, at *3 (N.D. Ill. 2017). But Plaintiff fails to argue why he believes the exhibits lack a proper foundation, nor does he proffer any factual basis to challenge authenticity or otherwise explain how the documents—all of which appear to be routine business records—will not be admissible at trial.

A party moving for summary judgment "need not explicitly set forth in its Local Rule 56.1(a)(3) statement the basis . . . for each piece of evidence being admissible nor need it anticipate and respond in advance to every possible objection that might be raised to the admissibility of a piece of evidence." *Fenje v. Feld*, 301 F. Supp. 2d 781, 811 (N.D. Ill. 2003). Without any explanation as to why the exhibits lack a proper

foundation or why they are otherwise inadmissible at trial, Plaintiff's authenticity objections are overruled. *See also id*. at 789 ("Even if a party fails to authenticate a document properly or to lay a proper foundation, the opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic.").

### 2.     Plaintiff's Hearsay Objections

For the purposes of the present motion, the law also does not require Defendant to articulate a hearsay exception, or prove that certain statements are not hearsay, for each piece of evidence it introduced. *Id*. at 811. Hearsay is defined, of course, as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c); *United States v. Rettenberger*, 344 F.3d 702 (7th Cir. 2003). Out-of-court statements offered for other purposes, however, such as showing the speaker's state of mind, as well as offers and negotiations between parties, are not hearsay. *Fenje*, 301 F. Supp. 2d at 811. Certainly, when Progress Rail and its employees state in a routine business record that they made a particular decision based upon information reported to them, such an exhibit would survive a hearsay objection. *See id*. ("While the statements reporting such information generally will be hearsay not admissible to show the truth of the reported information, the statements are not inadmissible hearsay for purposes of showing the information relied upon or considered in making a decision."). Thus, exhibits [44-19], [44-25], [44-26], [44-27], and [44-28] may be considered here. Additionally, Plaintiff's own prior statements in the investigatory interviews and disciplinary hearings—which were

made in proceedings attended by his Union Representative, *see, e.g.*, [45] ¶ 45, and which he at no point alleges were inaccurately transcribed or summarized—are also admissible as admission of a party-opponent. *Fenje*, 301 F. Supp. 2d at 811; *see also* [44-22] (accident report prepared by Plaintiff containing almost identical language to his investigatory interview statement, [44-25]).

### 3.   Plaintiff's Remaining Objections

Finally, Plaintiff also objects to many of Progress Rail's paragraphs for containing "more than a single concise statement of fact." *See, e.g.*, [45] ¶¶ 62, 64, 65, 66. But Local Rule 56.1(a) requires only that Progress Rail's 56.1(a)(3) statement "consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." This Court finds that Progress Rail has satisfied this requirement, and thus overrules Plaintiff's objections.

### B.   Plaintiff's General Employment & Supervisory Structure

Plaintiff worked as a material handler at Progress Rail's facility in LaGrange, Illinois from 2005 until his termination in April 2017. [45] ¶¶ 2, 33. Progress Rail is a manufacturer of diesel-electric locomotives and diesel-powered engines. *Id*. ¶ 2. While the parties dispute what exactly a material handlers' job responsibilities included, they agree that Plaintiff's duties encompassed loading and unloading materials of varying size and weight into material locations, performing inventory count, and assembling engine kits. *Id*. ¶ 33.

Jonathan Howard worked as a Warehouse Supervisor at Progress Rail and directly supervised Plaintiff from the beginning of 2016 through Plaintiff's termination. *Id.* ¶ 34. In addition to Plaintiff, Howard supervised nine employees: eight material handlers (two of whom were welders on temporary assignment with the department as material handlers) and one clerk. *Id.* George Pekarik served as the General Supervisor from 2006 through late September 2016, after which he was promoted and no longer had supervisory responsibilities over warehouse employees. *Id.* ¶ 36. As General Supervisor, Pekarik served as Howard's direct supervisor. *Id.* Mark Walker was promoted to General Supervisor in September of 2016, at which time he became Howard's direct supervisor. *Id.* ¶ 37.

## C. Progress Rail's Safety Protocol & Disciplinary Process

Progress Rail enforces "shop rules," which identify examples of behavior constituting grounds for corrective disciplinary action. *Id.* ¶ 16; [44-8]. Shop Rule 31 prohibits disregard of "safety rules of common safety practices." [44-8] at 3. Neither party disputes that one of these safety rules requires proper lifting techniques. [45] ¶ 24. Specifically, Progress Rail prohibits employees from manually lifting heavy materials; employees are required to use a mechanical lift assist, including a hoist or a lifting device, for lifting any material heavier than 35 pounds. *Id.* ¶¶ 25−26. Plaintiff does not dispute that he was aware of this policy and trained on Progress Rail's safety protocols for lifting heavy materials at his new hire orientation and throughout his employment. *Id.* ¶¶ 27, 38. As part of his new hire training, he was specifically trained on how to safely operate cranes used to lift materials. *Id.*

Progress Rail also enforces general safety rules regarding cell phone use. *Id.* ¶ 29. Under these rules, cell phones are prohibited while operating any equipment (mobile or stationary) and are "not permitted to be out in the open or visible within aisle lines of a manufacturing area," save for exceptional work-related purposes. [44-11] at 3.0. Again, Plaintiff does not dispute that he was aware of Progress Rail's cell phone policy. [45] ¶ 31.

When Progress Rail has reason to believe an employee has violated a shop rule, it holds an investigatory interview and disciplinary hearing prior to taking any disciplinary action. *Id.* ¶ 14. At the investigatory interview and disciplinary hearing, employees are entitled to Union representation. *Id.* Either party is also allowed to bring in witnesses to determine the facts and circumstances surrounding an incident. *Id.* The supervisor investigating the alleged infraction completes the investigatory interview and disciplinary hearing forms, which transcribe (in the interviews) and summarize (in the hearings) the meetings. *Id.*; *see, e.g.*, [44-19]; [44-25]; [44-26]; [44-27]; [44-28].

Once an employee has participated in an investigatory interview and disciplinary hearing, Progress Rail determines what disciplinary action to take against the employee. [45] ¶ 21. Progress Rail's employee rules of conduct contains a progressive disciplinary process for shop rule violations. *Id.* ¶ 21; [44-8] at 4. The policy outlines a gradual increase in discipline, beginning with a written reprimand, and progressing to a balance of shift (BOS), a BOS plus one, three, five, ten, or twenty working days, and discharge. *Id.* In making progressive discipline decisions, the

policy also provides that Progress Rail "will not take into account any prior infractions which occurred more than twenty-four months previously." [44-8] at 4. Although Plaintiff argues that Progress Rail is required to use the progressive discipline guidelines for all violations, Progress Rail maintains that serious infractions can result in more severe discipline, including immediate discharge, regardless of the last step in progressive discipline that was previously issued. [45] ¶ 23.

Whether, and to what extent, discipline is appropriate in a given situation is determined by the Manager of Labor Relations, Raymond Moroni, who reviews the severity of each infraction and the employee's disciplinary history. *Id.* ¶ 21. Safety violations resulting in personal injury are investigated and resolved by a separate Safety Committee, comprised of managers, the plant Safety Manager, the Safety Manager's supervisors, and a Vice-President. *Id.* ¶ 21; [44-6] at 112. Plaintiff's direct supervisor, Howard, does not sit on the Safety Committee. [45] ¶¶ 73, 99. Although Plaintiff argues there "is no evidence that the Safety Committee takes any independent action whatsoever" in such cases, Gilbert Ledger, the plant Safety Manager, stated in his affidavit that the Safety Committee reviews all documentation on an incident, including medical injury reports, investigatory interview and disciplinary hearing notes, and prior counseling on Progress Rail's policies. [44-9] ¶ 14.

### D.    Plaintiff's Overtime Complaint

In August of 2016, Plaintiff approached Pekarik to complain that Howard was not following Progress Rail's overtime equalization policy. [45] ¶ 48. Specifically,

Plaintiff complained that Howard was not affording overtime opportunities in accordance with Progress Rail's written policies, which state that "[i]nsofar as it is practicable for management to do so, overtime opportunities . . . will be equitably distributed among employees within applicable overtime equalization groups." [44-7] at 17. Plaintiff claims that at this meeting, he accused Howard of disproportionately offering overtime opportunities to younger employees, rather than following the equalization system. [45] ¶ 48; [46] at 3. Pekarik then explained the overtime equalization process to Plaintiff, and neither party disputes that "both sides listened and both sides said they'd work towards fixing the issue." [45] ¶ 48. Moreover, neither party disputes that Plaintiff recorded more overtime hours in 2016 than any other material handler under Howard's supervision. *Id*. ¶ 12.

### E.  Plaintiff's Cell Phone Suspension & Sweeping Assignment

Although the parties debate a variety of disciplinary issues that occurred over the course of Plaintiff's twelve years at Progress Rail, only a few incidents require discussion here.

First, in August of 2016, Howard issued a disciplinary notice to Plaintiff for violating Shop Rule 31 by using a cell phone on mobile equipment. *Id*. ¶ 44. Plaintiff points out that this was originally a "BOS plus 5 days," and that it was subsequently reduced to a "BOS plus 1 day." *Id*. Both parties agree that Plaintiff was ultimately given a "BOS plus 1 day," which is by all accounts a one-day suspension. *Id*. Although Plaintiff later produced a copy of his phone records to Pekarik to demonstrate that he was not talking on his phone at the time of the alleged violation, Pekarik disagreed,

believing the records did not prove that he was not *using* his phone in another way. *Id.* ¶ 46. The investigatory interview notes reflect that when asked whether his cell phone was in his hand when operating a fork truck, Plaintiff responded: "[i]t was on top of the truck." *Id.* ¶ 45; [44-19].

In early September 2016, Howard again reported to Pekarik that he had seen Plaintiff using his phone to take pictures of his work. [45] ¶ 47. After Plaintiff voluntarily let Pekarik look through his phone, and Pekarik determined there was not sufficient proof Plaintiff had been on his phone, he was not formally disciplined in any way. *Id.*

At some point after this September incident, Plaintiff was assigned to sweeping duties. Plaintiff asserts that Howard revoked his forklift license and assigned him to sweeping duties for three weeks, stating that "this is going to be your job until I tell you otherwise." [52] ¶¶ 93–94. Defendant asserts that Howard assigned Plaintiff sweeping duties on one occasion, for no more than a week, because Plaintiff either "had work restrictions or was not certified to operate a forklift." *Id.* Plaintiff does not dispute that he maintained the same position on the same shift, with the same rate of pay and benefits, for however long the sweeping assignment lasted. [44-2] at 85. Plaintiff states, and Progress Rail does not appear to dispute, that he continued sweeping until Howard was absent for a day and a substitute supervisor came to the unit and sent him to be recertified. [52] ¶ 96.

### F.     Plaintiff's Injury & Termination

Plaintiff reported a hand injury to Howard on February 16, 2017.  [45] ¶ 61.
He received on-site medical treatment at Progress Rail's medical department, after
which he was immediately transported to a hand specialist for further treatment.  *Id.*
Plaintiff's own report of the accident describes the injury:

> On February 16, 2017, as I was working in the area in front of the
> Supervisor's office, I walked in front of the pallet, cut the plastic, put in
> the hook, raised up the idle [s]haft and lowered it down into the car set.
> I took out the Hook and placed it on the stand.  I picked up the other
> Hooks and placed them between the two tubs.  I noticed papers in the
> tubs so I stopped; reached over, picked it up and I put it in the trash can.
> I noticed plastic was under the shaft so I reached over the [s]haft, lifting
> it up, it slipped out of my hand and hit my finger.

[44-22].  Progress Rail points to this report as evidence that Plaintiff did, in fact,
violate its lifting policy, as neither party disputes that the shaft was well over 35
pounds.  [45] ¶ 70.  Plaintiff, however, argues that he actually "used one hand to *shift*
the idler while retrieving plastic waste from the bottom of the carset."  *Id.* ¶ 71
(emphasis added).

An investigatory interview took place on March 22, 2017, once Plaintiff
returned to work from his injury.  *Id.* ¶ 64; [44-25].  Plaintiff, Howard, and Union
Representative Maurice Stovall were present.  *Id.*  A second investigatory interview
took place on March 23, 2017, with Plaintiff, Howard, and Stovall again present.  [45]
¶ 67; [44-26].  Progress Rail held a disciplinary hearing that same day, [45] ¶ 68; [44-
27], and a second disciplinary hearing also that same day; Plaintiff, Howard, Walker,
and Stovall attended both.  [45] ¶ 69; [44-28].

Because the February 16, 2027 incident involved a safety infraction, Progress Rail's Safety Committee served as the final arbiter. [45] ¶ 73. According to Ledger, the Committee reviewed "all documentation on the incident, including the medical injury report, Mr. McDaniel's statement, his previous workplace injuries, as well as any prior counseling on Progress Rail's lifting policies." *Id.* ¶ 74. On April 6, 2017, Progress Rail terminated Plaintiff and explained that he was being discharged for violating Shop Rule 31. [44-29]; [45] ¶ 76.

## II.    Legal Standard

Courts should grant summary judgment when the moving party shows that no genuine dispute exists as to any material fact and the evidence weighs so heavily in the moving party's favor that the moving party "must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56. A genuine dispute as to a material fact exists when, based upon the evidence, a reasonable jury could find for the non-moving party. *Anderson*, 477 U.S. at 248. To show a genuine dispute as to a material fact, the non-moving party must point to "particular materials in the record," and cannot rely upon the pleadings or speculation. *Olendzki v. Rossi*, 765 F.3d 742, 746 (7th Cir. 2014).

At summary judgment, courts must evaluate evidence in the light most favorable to the non-moving party and refrain from making credibility determinations or weighing evidence. *Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017) (citing *Anderson*, 477 U.S. at 255). The moving party bears the burden of establishing the lack of genuine disputes as to any material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## I.  Analysis

### A.  Count I: ADEA Discrimination

Plaintiff alleges that Progress Rail discriminated against him in violation of the ADEA by improperly writing him up and ultimately terminating him based upon his age. [1] ¶ 14. Specifically, he claims that he was treated less favorably by Progress Rail than "other, younger employees," and, but for his age, "he would not have been treated differently" and "ultimately would not have been harassed or terminated." *Id*. ¶¶ 94−95. Progress Rail counters that it disciplined Plaintiff for workplace violations and properly terminated him for violating Progress Rail's safety rules and procedures. *See, e.g.*, [51] at 1.

The ADEA protects individuals 40 years of age or older from employment discrimination based upon age, including termination. 29 U.S.C. §§ 623(a), 631(a); *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016). A terminated employee may prevail in an ADEA-based claim if he shows that "his termination would not have occurred but for his employer's age-based discriminatory motive." *Pitasi v. Gartner Grp. Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (internal citations omitted).

In analyzing ADEA claims on summary judgment, this Court asks "whether the evidence would permit a reasonable factfinder to conclude" that the plaintiff's age "caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This Court considers the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id*. This holistic analysis, set forth in *Ortiz*, supplements, rather than alters, the burden-shifting framework for discrimination claims that the Seventh Circuit created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973). *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719–20 (7th Cir. 2018); *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). As a result, courts addressing discrimination claims now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" under *Ortiz*. *David*, 846 F.3d at 224. Because the parties employ the *McDonnell Douglas* structure, this Court will assess Plaintiff's evidence in those terms, as well as under *Ortiz*'s holistic approach. *See id.*; *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 837 (N.D. Ill. 2017).

### 1.    Plaintiff Fails to State a *Prima Facie* Case

*McDonnell Douglas* requires a plaintiff to state a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class; (2) he performed reasonably on the job in accordance with the defendant's legitimate expectations; (3) despite his reasonable performance, he was subjected to an adverse employment

action; and (4) similarly situated employees outside of his protected class received more favorable treatment from the defendant. *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 824 F.3d at 765. Once a plaintiff establishes a prima facie case, the burden shifts to the employer to offer "a legitimate, non-discriminatory reason for the employee's termination." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the employer does so, the employer merits summary judgment "unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Plaintiff's case fails at the outset. Although the parties spend considerable time disputing whether Plaintiff met Progress Rail's legitimate expectations, as well as whether all of Progress Rail's disciplinary measures constitute adverse employment actions, Plaintiff's *prima facie* case fails for the simple reason that he fails to properly identify a single similarly situated employee that Defendant treated more favorably.

The similarly situated analysis "calls for a 'flexible, common-sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). The purpose of such an analysis is to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* (internal citations omitted). Thus, while similarly situated employees need not be identical in

every conceivable way to the plaintiff, they "must be directly comparable to the plaintiff in all material respects." *Id*. In other words, there must be "enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play." *Barricks v. Eli Lilly and Co.*, 481 F.3d 556, 560 (7th Cir. 2007). The Seventh Circuit has held that to allow for this meaningful comparison, a typical *McDonnell Douglas* plaintiff must show, at a minimum, that the comparators: "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (internal citations omitted).

Here, Plaintiff has failed to meet the minimum standard articulated in *Coleman*. Plaintiff fails to set forth a single, specific comparator employee, giving this Court no opportunity to conduct the "meaningful comparison" required in *Barricks*. 481 F.3d at 560. Instead, Plaintiff's arguments consist entirely of generalized, conclusory statements about "other" or "younger" employees.

For example, in his complaint, Plaintiff merely alleges that Howard accused him of not being as productive as other members of "the group (all of whom were younger)." [1] ¶ 39. He also alleges that at one point, Howard "would have to have walked by other employees in the unit who would have been on their phones," and on another occasion, Howard assigned "a substantially larger amount of work to McDaniel than the other employees in McDaniel's group." *Id*. ¶¶ 29, 46. But at no point does Howard articulate who those "other employees" in "the group" might be,

nor does he provide any details about their job responsibilities or whether they were outside of Plaintiff's protected class.

And even after discovery, Plaintiff failed to provide any additional information or argument in his Local Rule 56.1 statement of additional facts [45] and response to Progress Rail's motion for summary judgment [46]. Instead, he simply concludes that Plaintiff was "similarly situated to the other Material Handlers on his work crew" in that they had the same job title, job description, responsibilities, and supervisor. [46] at 12. But again, without any evidence to support these conclusory statements, such as who these individuals were, their age in relation to Plaintiff, their work history, or even what their responsibilities were, Plaintiff cannot establish that his coworkers were similarly situated for purposes of his ADEA claim. *See, e.g.*, *Skiba*, 884 F.3d at 723–24 (comparator evidence consisting solely of a table listing the names and ages of thirty-seven younger employees and the positions for which they were hired was not enough, without "amplifying detail" about the employees' qualifications or employment history, to prove that they were similarly situated to plaintiff in an ADEA discrimination case); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) (finding that plaintiffs' alleged comparator was not similarly situated because they offered "no evidence about who [she] was, what her position was, who supervised her, why she refused to work in her assigned area, and whether she had a similar disciplinary record and similar performance reviews").

Plaintiff, in his deposition, does mention in passing four other co-workers: "Wendy Boular," "Alex," "Rudy," and "William." [44-2] at 62. But he fails to explain

how these individuals might constitute comparators. Indeed, he fails to even reference these individuals in his complaint, Local Rule 56.1 statement of additional facts, or his response to Progress Rail's motion for summary judgment. *See generally* [1]; [45]; [46] at 3; *see also Johnson*, 892 F.3d at 898−99 (noting that the court was not required to "dig through the statement of facts" to find similarly situated employees).

Moreover, even if Plaintiff had alleged that these specific co-workers were similarly situated employees treated more favorably than him, the record indicates that they would fail to serve as proper comparators for several reasons. First, Plaintiff testified that Boular was "maybe in her late 50s—mid 50s" and a clerk. [44-2] at 62; [45] ¶ 49. In contrast, Plaintiff is 56 years-old and a material handler. [44-2] at 10. An individual can still bring a cognizable claim under the ADEA if discriminated against in favor of a similarly situated employee over 40 years of age, so long as the plaintiff lost out "because of his age." *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 930 (7th Cir. 2018). Here, however, Plaintiff has specifically alleged that he was discriminated against in favor of *younger* employees. *See, e.g.*, [46] at 12. Therefore, without any facts showing that she was younger than Plaintiff, or that she shared the same responsibilities as a material handler, Boular cannot serve as a similarly situated employee for purposes of showing Plaintiff was discriminated against *because of his age. Id.*

William similarly cannot serve as a similarly situated employee, as not only did Plaintiff describe him as being ambiguously "up in age," but Plaintiff also did not

clarify when he worked with William or what job title William had, stating only that "he was loaned from another department." [44-2] at 62–63; *see, e.g., Johnson*, 892 F.3d at 897 (finding the plaintiff failed to meet his similarly situated employee burden because he failed to set forth factual information about his comparator's resume, background, or qualifications).

Finally, although Plaintiff does state that both Alex and Rudy "could have been" in their 30s, and therefore younger than Plaintiff, he fails to provide any information about them other than that they were under Howard's supervision. [44-2] at 62–63, 134. Evidence of common supervision is not enough. *See Johnson*, 892 F.3d at 898–99 (finding a comparator was not similarly situated because "the only evidence that the plaintiff and [comparator] were similarly situated is that they shared the same supervisor. We have no idea whether [she] was otherwise similarly situated, or whether there were any unusual circumstances, mitigating factors, difference in seniority, that would have made the comparison inapt.").

Without any factual support as to who the "younger" and "other" employees that Plaintiff claims were treated more favorably than him are, Plaintiff's claim cannot proceed under *McDonnell Douglas*. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) ("[W]e cannot compare [an employer's] treatment of [a plaintiff] and [a co-worker]" if the plaintiff "fail[s] to meet her burden of establishing that [the co-worker] is a similarly situated employee"). He has not demonstrated enough common factors among them "to allow for a meaningful comparison in order to divine whether intentional discrimination was at play."

*Barricks*, 481 F.3d at 560 (7th Cir. 2007). Plaintiff has therefore failed to establish a *prima facie* case of ADEA discrimination.

### 2. Plaintiff Fails to State a Claim under *Ortiz*

Plaintiff's claim also fails under *Ortiz*'s holistic approach. Under *Ortiz*, this Court must assess Plaintiff's evidence cumulatively and determine whether it would permit "a reasonable factfinder to conclude" that his age "caused the discharge or other adverse employment action." 892 F.3d at 765; *David*, 846 F.3d at 224. This record, considered as a whole, does not allow this Court to do so.

Plaintiff argues that but for his age, he would not have been written up or terminated. [1] ¶¶ 94–95. But the record lacks any evidence that this is true. Here, where Plaintiff's discrimination claim rests entirely upon Progress Rail favoring younger workers, this Court has already found that he failed to identify any similarly situated, younger employees. And crucially, as explained below, the record contains no indication that Progress Rail's decisions to suspend and terminate Plaintiff were due to his age.[1]

First, the record demonstrates that the Safety Committee's ultimate decision—that Plaintiff violated Progress Rail's lifting policy—had nothing to do with Plaintiff's age. Progress Rail's safety protocol prohibits lifting equipment over 35 pounds. [44-3] ¶ 15; [44-8] at 2. Plaintiff's own report of the incident, prepared by him through

---

[1] In addition to his cell phone policy-violation suspension and termination, Plaintiff claims that being "forced to sweep the entire factory for three weeks" was also discrimination in violation of the ADEA. Progress Rail claims this assignment lasted for a week at most and was due to Plaintiff's licensing issues. [52] ¶ 94. Regardless, Plaintiff at no point claims that this assignment was based upon age or an instance of Progress Rail treating younger employees more favorably than Plaintiff. Thus, this Court considers the sweeping assignment for the purposes of potential retaliation only.

his union representative, states that: "I noticed plastic was under the shaft so I reached over the [s]haft, *lifting* it up, it slipped out of my hand and hit my finger." [44-22] (emphasis added). Neither party disputes that the material at issue was over 100 pounds—well over Progress Rail's 35-pound lifting limit. [45] ¶¶ 26, 70. And although Plaintiff claims now that because he "shifted," rather than lifted, the equipment, he did not violate the rule, *see e.g.*, [46] at 12, this is merely a matter of semantics; the undisputed portions of the record contain a legitimate basis for the Safety Committee's ultimate conclusion that he violated Progress Rail's safety protocol. While Plaintiff clearly disagrees with Progress Rail's decision to have Howard conduct the investigatory interviews and disciplinary hearings following the incident, he offers no evidence to suggest that the Safety Committee had any reason to believe Howard's transcriptions (and reports of Plaintiff's own statements during these proceedings) were false or at all inaccurate when they considered them as part of their investigation. Notably, all of these statements confirm the lifting of the shaft. [44-25]; [44-26]; [44-27]; [44-28]. And the Safety Committee at no point mentioned or referenced Plaintiff's age. [45] ¶ 75. In short, there is simply no evidence to show that the Safety Committee terminated Plaintiff for any reason other than the lifting incident.

Second, the record provides no evidence that Plaintiff's cell phone suspension occurred because of his age. Although Plaintiff disputes what constitutes "using" a cell phone in regards to the incident that resulted in a one-day suspension, [45] ¶ 45, this is again a matter of semantics; he does not dispute that his cell phone was out

on the top of the truck he was using, [44-19]; [45] ¶ 45, which clearly violates Progress Rail's safety policies. *See* [44-11] at 3.0 ("The use of cell phones while operating any equipment (mobile or *stationary*) is prohibited . . . [c]ell phones are not permitted to be *out in the open or visible* within the aisle lines of a manufacturing area") (emphasis added). And while Plaintiff claims that "Alex and Rudy" were "seen on numerous occasions talking on their phones" without disciplinary consequences, [44-2] at 133, outside of this statement, Plaintiff fails to provide any evidence that those employees—neither of whom have shown to be similarly situated to Plaintiff—used their phones in a place or manner that violated Progress Rail's cell phone safety policy. Again, there is simply no evidence to suggest Defendants imposed the discipline due to Plaintiff's age.

Plaintiff argues that even if he did violate safety protocol, Progress Rail's failure to follow its "progressive discipline" policy in disciplining and terminating Plaintiff serves as evidence of discrimination. [46] at 7. The policy outlines a gradual increase in discipline, ranging from "written reprimand" to "discharge." [44-8] at 4. The policy also provides that in making progressive discipline decisions, Progress Rail "will not take into account any prior infractions which occurred more than twenty-four months previously." *Id*. Plaintiff argues that his one-day suspension for cellphone use, as well as his termination, both violated this policy, as he did not have enough other infractions within a two-year period to justify those outcomes. [46] at 4, 7.

Accepting that Plaintiff's punishments were not "progressive," Pekarik testified that more serious violations, such as safety violations, can justify more severe discipline, including immediate discharge, under the policy. [44-6] at 32; *see also* [44-3] ¶ 9 (statement from Moroni that "[a] more serious infraction can result in more severe discipline, including immediate discharge regardless of the last step in progressive discipline that [was] previously issued.").

Plaintiff has offered no evidence linking Progress Rail's discipline decisions to his age. As the Seventh Circuit has noted, under *Ortiz*, at the "end of the day, the question is simply whether the same events would have transpired if plaintiff had been younger than 40 and everything else had been the same." *Skiba*, 884 F.3d at 725 (internal citations omitted). Considering the evidence as a whole, the answer is yes. Progress Rail believed Plaintiff violated its safety policies, and he was disciplined and ultimately terminated as a result. There is simply no evidence to suggest his age played a role in these decisions.

### 3.    Plaintiff's "Cat's Paw" Theory Fails

Finally, Plaintiff argues that Progress Rail's termination decision—made by its Safety Committee—was influenced by the age-based bias of his supervisor Howard, [46] at 14, an argument known as the "cat's paw" theory of liability. The "cat's paw" applies "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018) (citing *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015)). For the

"cat's paw" theory to succeed, however, a plaintiff must provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Robinson*, 894 F.3d at 832.

Here, even assuming that Plaintiff could produce evidence of Howard's age-based animus (which Plaintiff has failed to do), there is simply no evidence that such bias constituted the proximate cause of Plaintiff's discipline or termination. Instead, Progress Rail had every reason to believe Plaintiff violated its safety policies, and Plaintiff offers no evidence that other, younger employees who committed the same violations were treated any more favorably in such a situation.

Moreover, the record shows that the Safety Committee—which ultimately made the decision to terminate Plaintiff—considered a variety of documents not prepared by Howard, such as the medical injury report, Plaintiff's statements (which, again, contained his admission that he lifted material over 35 pounds, [44-22]), a summary of Plaintiff's previous workplace injuries, and prior counseling on Progress Rail's lifting policies—all of which demonstrated Plaintiff had violated company policy. [44-9] ¶ 14. *See Martino v. MCI Commcn's. Servs.*, 574 F.3d 447 (7th Cir. 2009) (to avoid liability under a cat's paw theory, "a decisionmaker is not required to be a paragon of independence. It is enough that the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision."). Although Plaintiff argues that this investigation in fact was "limited exclusively to materials prepared and compiled by Howard," he

does not cite evidence supporting this conclusory statement. *See* [45] ¶ 74. Absent any evidence that the Safety Committee ignored the evidence not produced by Howard and terminated Plaintiff for any reason besides a safety protocol violation, Plaintiff's cat's paw theory cannot succeed.

This Court thus grants summary judgment as to Count I.

## B.     Count II: ADEA Retaliation

In his retaliation claim, Plaintiff argues that he was engaged in protected activity when he: (1) complained Howard was favoring younger workers over him in violation of Progress Rail's seniority-based overtime policy; and (2) directly disputed Howard's "false allegations of cellphone use while on the job," presumably referring to when he was suspended for violating Progress Rail's cell phone policy. [46] at 15. He also alleges that Progress Rail's retaliatory actions consisted of his suspension for cell phone use, reassignment to sweeping duties, and ultimate termination. *See generally* [46].

To succeed on a retaliation claim, a plaintiff can take a "direct" or "indirect" approach. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). Here, Plaintiff has chosen to take the indirect approach. [46] at 15. Under the indirect approach, a plaintiff must present evidence that: "(1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* at 918. If a plaintiff makes that showing, "the burden shifts to the employer to articulate some legitimate,

nonretaliatory reason for its action," which is then up to the plaintiff to expose as pretext." *Id.* Consistent with the Seventh Circuit's opinion in *Ortiz*, 834 F.3d 760, this Court will address Plaintiff's claims under the indirect approach, as well as ask whether the record, as a whole, contains sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused Plaintiff's suspension and termination. *See, e.g.*, *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 671 (N.D. Ill. 2016). Ultimately, Plaintiff's claim fails under both frameworks.

### 1. Plaintiff's Retaliation Claim Fails under the Indirect Approach

Under the indirect approach, Plaintiff's claim fails because, even assuming he engaged in protected activity and was otherwise meeting Progress Rail's legitimate expectations, Plaintiff fails to name a single similarly situated employee. Progress Rail found that Plaintiff violated safety policies both when he lifted the shaft and left his cell phone "out" on the truck. As such, he must identify a comparator who committed similar actions but was not disciplined, or disciplined to a lesser degree. *See, e.g.*, *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018) (finding that the plaintiff's retaliation claim failed under the indirect approach because although she argued "that management did not discipline anyone else for an error that occurred many months earlier," she identified "no specific person who committed an error many months before management learned of the error.").

Likewise, to succeed on his argument that reassignment to sweeping duties constituted retaliation, he would have to identify similarly situated employees who

committed similar actions and received a lesser punishment.[2]  But Plaintiff fails to properly set forth any proposed comparators, simply stating in conclusory fashion that there is "evidence that he was treated less favorably than similarly situated employees who did not contest Howard's failure to comply with Progress Rail's policies." [46] at 15.  Plaintiff thus cannot succeed under the indirect approach.

### 2.    Plaintiff's Retaliation Claim Fails Under *Ortiz*

### a.    Plaintiff's Cell Phone Complaint is not Protected

Applying *Ortiz's* holistic approach yields the same result.  First, Plaintiff argues that he "engaged in protected activity when he directly disputed, and disproved, Howard's false allegations of cellphone use," which resulted in his suspension.  But for a complaint to constitute protected activity, it must include an objection to discrimination on the basis of age.  29 U.S.C. § 623; *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012).  Simply "complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).  The record evidence shows that while Plaintiff disputed whether he was on his phone or otherwise "using" it in this instance, [45] ¶¶ 44−45, at no point did he complain that Howard targeted him because of his age.  Absent facts showing that Plaintiff made

---

[2] Notably, although Plaintiff argues that the responsibilities of a material handler did not include sweeping, Pekarik testified as to material handlers: "[E]veryone sweeps.  It's part of their job."  [44-6] at 116; *see also* [44-3] ¶ 5 ("The job duties of a material handler also encompass general maintenance of the warehouse including sweeping").

age-related complaints when disputing his suspension, this challenge does not constitute protected activity.

### b. No Causal Connection Exists between Plaintiff's Overtime Complaint and Any Adverse Action

Even if this Court assumes that Plaintiff's overtime opportunity complaint constituted a protected activity, the record shows no connection between this complaint and the cell phone suspension, termination, or sweeping assignment. As discussed above, Progress Rail genuinely believed, and had good reason to do so, that Plaintiff violated its cell phone policy and lifting policy. Plaintiff has also failed to produce any evidence that another employee (who did not complain about overtime) escaped suspension or termination, despite using their cell phone or receiving an injury in a similar fashion. And although Plaintiff may show temporal proximity—Howard reported him for a cellphone violation on August 29, 2016 and Plaintiff claims he complained about overtime opportunities at some point earlier that month, [45] ¶¶ 44, 48—"timing alone is insufficient to establish a genuine issue of material fact to support a retaliation claim." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). In fact, Plaintiff offers no evidence to demonstrate that the Safety Committee even knew about his overtime complaint when they made the decision to terminate Plaintiff.

Plaintiff's sweeping assignment similarly has no connection to his initial overtime complaint or any sort of age-related protected activity. First, a reassignment to sweeping duties, with no change in position or pay, fails to constitute an adverse employment action. *See, e.g.*, *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir.

2004) (an adverse employment action "must be materially adverse, not merely an inconvenience or a change in job responsibilities."). Here, as to this temporary reassignment, Plaintiff merely states that at some point "after McDaniel returned" from serving his cell phone suspension, Howard revoked his forklift license and assigned him to sweeping duties. [46] ¶¶ 93–95. Even if this statement is true, Plaintiff's decision to contest his *cell phone suspension* was not a protected activity; and thus, Howard's statement that "this [sweeping] is going to be your job until I tell you otherwise," is not enough on its own to demonstrate a causal link to his earlier *overtime complaint. Id.* ¶ 94. Without more facts to suggest that Howard was retaliating in response to Plaintiff's initial overtime complaint, or even the reassignment's temporal proximity to the initial overtime complaint, there is not enough evidence to support a retaliation claim.

This Court thus grants summary judgment as to Count II.

## C.    Count III: Retaliatory Discharge

Plaintiff's final claim is that Progress Rail retaliated against him for asserting his rights under the Illinois Workers' Compensation Act (IWCA), in violation of Illinois law. [1] ¶¶ 100–109.

In Illinois, it is unlawful to terminate an employee in retaliation for exercising his rights under the IWCA. *See Gordon v. Fedex Freight Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) (citing *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878–79 (Ill. 1981)). To state a valid retaliatory discharge cause of action, an employee must prove: "(1) his status as an employee of the defendant before injury; (2) his exercise of a right

granted by the Workers' Compensation Act; and (3) a causal relationship between his discharge and the exercise of his right." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994). Neither party disputes that Progress Rail terminated Plaintiff's employment and that he was an employee before his injury. Thus, the only issues are whether Plaintiff can establish that he exercised a right guaranteed by the IWCA and that a causal relationship exists between the exercise of this right and his termination.

### 1. Plaintiff Exercised a Right under the IWCA

There are several ways in which an employee may exercise a right under the IWCA. First, an employee can file a workers' compensation claim. *Gordon*, 674 F.3d at 773. Here, there is no evidence that Plaintiff did so. *See generally* [45]; [46].

Second, even if there has been no filing of a claim, retaliatory discharge "may apply where a plaintiff is preemptively fired to prevent such a filing." *Gordon*, 674 F.3d at 773. But factual support that the employer was "informed or in some way found out about the plaintiff's intent to pursue relief under the Act is essential to a retaliatory discharge action." *Id.* (citing *Roger*, 21 F.3d at 149–50). In Plaintiff's response memorandum, he states that in March of 2017, he "returned to Progress Rail to inquire about what steps he needed to take to be eligible for workers' compensation as a result of his injury." [46] at 16. Plaintiff cites no evidence for this statement. And it is undisputed that neither the Safety Committee, nor any of the supervisors involved, ever discussed a workers' compensation claim with him. [45]

¶¶ 53, 75.  Without any factual support that anyone at Progress Rail knew Plaintiff intended to file a claim, he cannot proceed under this approach.

Third, an employee can exercise a right under the IWCA by "requesting and seeking medical attention." *Gordon*, 674 F.3d at 773 (citing *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909 (Ill. 1988)).  In *Hinthorn*, the Illinois Supreme Court held that "the overriding purpose of the [IWCA] is to protect injured employees by ensuring the availability of medical treatment, by shifting the financial burden of such treatment to the employer." 519 N.E.2d at 913.  Thus, an employee who was told to seek other employment after she informed the vice president of the company of her back injury and intent to seek medical attention had a claim for retaliatory discharge. *Id.* at 910−13.  Here, Progress Rail was certainly aware that Plaintiff was requesting and seeking medical attention, as neither party disputes that he was "provided on-site medical treatment at Progress Rail's medical department and immediately thereafter transported to a hand specialist for further treatment."  [45] ¶ 62.  Under *Hinthorn*, Plaintiff has met his initial burden of demonstrating the exercise of a right under the IWCA.  Therefore, this Court must determine whether he can establish a causal relationship between this protected activity and termination.

### 2.    Plaintiff Fails to Establish a Causal Relationship

Illinois does not apply the *McDonnell Douglas* burden-shifting framework in resolving retaliatory discharge claims.  *Gordon*, 674 F.3d at 774.  Instead, Plaintiff "must affirmatively show that the discharge was primarily in retaliation for his exercise of a protected right" to establish a causal relationship.  *Roger*, 21 F.3d at 149.

To do so, he must "proffer sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Gordon*, 674 F.3d at 774. If Plaintiff meets this burden, then Illinois law requires Progress Rail to provide a legitimate reason for its decision to terminate Plaintiff. *Id.*

Plaintiff has failed to carry this burden. As to an unlawful motive, the only factual theory Plaintiff proffers—aside from the unsupported statement that he returned to Progress Rail to inquire about being eligible for workers' compensation, [46] at 16—is the short time span (February 16, 2017 to April 6, 2017) between his injury and termination, and his "cat's paw" argument. [45] ¶ 64.

But as already discussed in relation to Plaintiff's other claims, temporal proximity is not enough to create a genuine issue of material fact. *See Gordon*, 674 F.3d at 775; *Roger*, 21 F.3d at 149 ("The causality requirement calls for more than a sequential connection."). And as this Court has also already noted, the record fails to support a finding that Howard improperly influenced the Safety Committee under a "cat's paw" theory. In *Gordon*, the Seventh Circuit found that although the plaintiff fell and sought medical treatment just one day prior to the company's decision to eliminate her position, that fact, on its own, could not support a jury inference that the company acted with an improper motive. 674 F.3d at 775. Here, no reasonable jury could find an improper motive where: (1) the injury itself was the result of a safety violation; (2) almost two months had passed between the injury and termination; (3) in that two-month period, Progress Rail conducted a series of

investigatory interviews and deliberations; and (4) a separate Safety Committee determined whether to terminate plaintiff based upon a comprehensive record.

Therefore, this Court grants summary judgment as to Count III.

## IV. Conclusion

This Court grants Defendants' motion for summary judgment [42]. The Clerk shall enter judgment for Defendant and against Plaintiff. All dates and deadlines are stricken. Civil case terminated.

Dated: November 1, 2018

Entered:

John Robert Blakey
United States District Judge